FILED
United States Court of Appeals
Tenth Circuit

April 8, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ERIC VERLO; JANET MATZEN; and
FULLY INFORMED JURY
ASSOCIATION,

     Plaintiffs - Appellees,

v.

THE HONORABLE MICHAEL
MARTINEZ, in his official capacity as
Chief Judge of the Second Judicial District,

     Defendant - Appellant,

v.

THE CITY AND COUNTY OF DENVER,
COLORADO, a municipality; ROBERT C.
WHITE, in his official capacity as Denver
Chief of Police,

     Defendants - Appellees.

No. 15-1319

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CV-01775-WJM-MJW)**
_____

Stephanie Lindquist Scoville, Senior Assistant Attorney General, Office of the Attorney
General for the State of Colorado, Denver, Colorado (Cynthia H. Coffman, Attorney
General; Frederick R. Yarger, Solicitor General; Matthew D. Grove, Assistant Solicitor
General; Ralph L. Carr, Colorado Judicial Center, Denver, Colorado, with her on the
briefs) for Defendant - Appellant.

David A. Lane, Killmer, Lane & Newman, LLP, Denver, Colorado, for Plaintiffs - Appellees.

Wendy J. Shea, Assistant City Attorney; Geoffrey C. Klingsporn, Assistant City Attorney; Evan P. Lee, Assistant City Attorney; Cristina Peña Helm, Assistant City Attorney, Denver City Attorney's Office, Denver, Colorado, filed a brief on behalf of Defendants - Appellees.

_____

Before **BRISCOE**, **McKAY**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

This is an interlocutory appeal challenging the district court's grant of a preliminary injunction, enjoining in part the enforcement of an administrative order (Order) issued by Defendant-Appellant Judge Michael Martinez, acting in his official capacity as Chief Judge of the Second Judicial District of Colorado (Judicial District). The Order prohibits all expressive activities within an area immediately surrounding the Lindsey-Flanigan Courthouse in Denver (Courthouse). Plaintiffs-Appellees Eric Verlo, Janet Matzen, and the Fully Informed Jury Association (collectively, Plaintiffs) sought the preliminary injunction to stop enforcement of the Order against their expressive activities. Following an evidentiary hearing, the district court enjoined enforcement of a portion of the Order as against Plaintiffs. The Judicial District now appeals.

Based on the arguments made and evidence presented at the preliminary injunction hearing, we hold the district court did not abuse its discretion in granting Plaintiffs' motion in part. Although we affirm the district court's order granting a limited preliminary injunction, we express no opinion as to whether a permanent injunction

2

should issue. Instead, we provide guidance to the district court and the parties regarding the factual inquiry and the applicable legal standard relevant to that question on remand.

## I. BACKGROUND

The genesis of this case is an incident involving nonparties. On July 27, 2015, two men were distributing pamphlets on the plaza outside the Courthouse (Plaza). The pamphlets contained information about jury nullification, a practice in which a jury refuses to convict a defendant despite legal evidence of guilt because the jury members believe the law at issue is immoral.[1] Both men were arrested and charged with jury tampering in violation of Colorado law. *See* Colo. Rev. Stat. § 18-8-609(1) ("A person commits jury-tampering if, with intent to influence a jury's vote, opinion, decision, or other action in a case, he attempts directly or indirectly to communicate with a juror other than as a part of the proceedings in the trial of the case.").

Plaintiffs, like the men who were arrested, wish to distribute literature relating to and advocating for jury nullification to individuals approaching the Courthouse who might be prospective jurors. Fearing they too would be subject to arrest, Plaintiffs brought suit against the City and County of Denver and Robert C. White, Denver's police chief, in his official capacity (collectively, Denver) to establish their First Amendment right to engage in this activity. On the same day they filed suit, Plaintiffs also moved for a preliminary injunction, seeking to restrain Defendants from taking action to prevent

---

[1] Jury nullification has been defined as "[a] jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness." *Jury Nullification*, Black's Law Dictionary (10th ed. 2014).

Plaintiffs from distributing jury nullification literature on the Plaza. Two days later,

Plaintiffs amended their complaint to also challenge the Order issued by the Judicial

District.

That Order, entitled Chief Judge Order Regarding Expressive Activities at the

Lindsey-Flanigan Courthouse, states in relevant part:

> The Court has the responsibility and authority to ensure the safe and orderly use of the facilities of the Second Judicial District; to minimize activities which unreasonably disrupt, interrupt, or interfere with the orderly and peaceful conduct of court business in a neutral forum free of actual or perceived partiality, bias, prejudice, or favoritism; to provide for the fair and orderly conduct of hearings and trials; to promote the free flow of pedestrian and vehicular traffic on sidewalks and streets; and to maintain proper judicial decorum. Those having business with the courts must be able to enter and exit the Lindsey-Flanigan Courthouse freely, in a safe and orderly fashion and unhindered by threats, confrontation, interference, or harassment. Accordingly, the Court hereby prohibits certain expressive activities on the grounds of the Courthouse, without regard to the content of any particular message, idea, or form of speech.

> **Prohibited Activities:** The activities listed below shall be prohibited in the following areas: anywhere inside the Lindsey-Flanigan Courthouse, including courtrooms, corridors, hallways, and lobbies; the areas, lawns, walkways, or roadways between the Courthouse and public sidewalks and roads; and any areas, walkways, or roadways that connect public sidewalks and roads to Courthouse entrances or exits. This includes, but is not limited to, the Courthouse entrance plaza areas on the east and west sides of the Courthouse as depicted in the highlighted areas of the attached map.

> 1. **Demonstrating; picketing; protesting; marching; parading; holding vigils or religious services; proselytizing or preaching; distributing literature or other materials, or engaging in similar conduct that involves the communication or expression of views or grievances; soliciting sales or donations; or engaging in any commercial activity; unless specifically authorized in writing by administration;**

> 2. **Obstructing the clear passage, entry, or exit of law enforcement and emergency vehicles and personnel,**

4

**Courthouse personnel, and other persons having business with the courts through Courthouse parking areas, entrances, and roadways to and from Courthouse and Courthouse grounds;**

3. **Erecting structures or other facilities, whether for a single proceeding or intended to remain in place until the conclusion of a matter; or placing tents, chairs, tables, or similar items on Courthouse grounds; except as specifically authorized in writing by administration; and**

4. **Using sound amplification equipment in a manner that harasses or interferes with persons entering or leaving Courthouse grounds or persons waiting in line to enter the Courthouse.**

The Order was accompanied by an image depicting an aerial view of the Courthouse and its grounds, with the areas in which the Order prohibited expressive activity highlighted in yellow (Restricted Areas).



The Courthouse is bordered on its north side by Colfax Avenue and on its west side by Fox Street. Both Colfax Avenue and Fox Street have public sidewalks running along the perimeter of the Courthouse. Immediately to the east of the Courthouse lies the Plaza. The Plaza is bisected by Elati Street, which is closed to traffic other than police vehicles. Elati Street runs through a large circular area (Main Plaza) between the Courthouse and the Van Cise-Simonet Detention Center (Detention Center), which houses pretrial detainees. The Main Plaza contains planters, benches, public artwork, sidewalks, and gravel areas and is suitable for public gatherings.

Of relevance to this appeal are the Restricted Areas, which include an arc-shaped walkway and planter area immediately to the east of the Courthouse. The arced walkway runs from the corner of Elati Street and Colfax Avenue in a curved path across the front of the Courthouse and ends where it intersects with an open area in front of the Courthouse containing planters and benches (the Patio), which also forms part of the Restricted Areas. The Patio provides access to the main entrance on the east side of the Courthouse. Thus, the Restricted Areas encompass only the portions of the Plaza closest to the Courthouse.

The Judicial District opposed Plaintiffs' motion for a preliminary injunction and, in doing so, defended the Order. In contrast, Denver entered into a joint stipulation (the Stipulation) with Plaintiffs. The Stipulation asserted that the entire Plaza between the Courthouse and the Detention Center—specifically including the Restricted Areas—was "a public forum and any content-based regulations must be narrowly drawn to effectuate a compelling state interest and reasonable time, place and manner regulations." It further

7

acknowledged that Plaintiffs were entitled to distribute jury nullification literature on the Plaza and pledged that Denver would not "arrest or otherwise charge Plaintiffs for handing out literature regarding jury nullification so long as Plaintiffs do not violate Colorado law or Denver's Revised Municipal Code when they are handing out their literature." The Stipulation specifically referenced the Judicial District's Order, indicating Denver did not "intend to enforce [the Order] as written and will only impose content and viewpoint neutral reasonable time, place and manner restrictions on the use of the Plaza, and/or other exterior areas surrounding the Plaza if Denver determines that a compelling need exists to do so."

At the preliminary injunction hearing, the parties called only two witnesses. Plaintiffs called Commander Antonio Lopez of the Denver Police Department. Commander Lopez described the Plaza as a public "open space" much like the city's various parks. He testified that in the five years since the Courthouse opened he has witnessed "more First Amendment activity take place in [the Plaza] than [he] can recall." Specifically, Commander Lopez described a variety of protest activities "at one point . . . averaging about two or three a week" in the Plaza. He further testified that the Denver Police Department had never taken steps to stop protest activity in the Plaza, other than intervening if protesters became violent or otherwise broke the law. Relevant to this appeal, Commander Lopez testified that in his experience, the entire Plaza—including the Restricted Areas—has traditionally been used for First Amendment protest activities. On cross-examination, Commander Lopez acknowledged that the "majority" of the protests

8

in the Plaza occurred closer to the Detention Center, but that he had also seen protests directed at the Courthouse.

The Judicial District called Steven Steadman, administrator of judicial security for Colorado. Mr. Steadman testified that the Order was motivated by concern about anticipated protests of a verdict in a death penalty case being tried at the Courthouse. Mr. Steadman explained that he met with Chief Judge Martinez to discuss security concerns relating to that verdict and recommended the Judicial District adopt a policy similar to one recently implemented in Arapahoe County during another high-profile capital trial.

Mr. Steadman also testified about the design of the Plaza, including the Restricted Areas. He indicated that the planters, gravel areas, and sidewalks were intentionally designed to "signal to the average user how to find their way, and where you should go and what the main travel ways are." Mr. Steadman explained that the Patio and arced walkway's "sole purpose is to allow people, the public, to enter and exit the [Courthouse] without being interfered with." But Mr. Steadman also stated that, prior to imposition of the Order, protestors—including pamphleteers—were allowed to protest immediately in front of the doors to the Courthouse, provided they did not interfere with ingress or egress from the Courthouse. He explained that the "general response" of protestors was to cease their activities when requested by Courthouse security not to interfere with public access to the Courthouse. Mr. Steadman further testified that no person had ever been arrested for blocking ingress or egress from the Courthouse since it opened in 2010. Important to this appeal, Mr. Steadman acknowledged that Plaintiffs' activities of passing out jury

9

nullification literature did not present "any security risk" beyond what had previously been tolerated without incident throughout the time the Courthouse had been open.

The district court also accepted a proffer of Plaintiffs' testimony, indicating that their intent was to approach people entering the Courthouse to discuss quietly the concept of jury nullification and to distribute their literature. Plaintiffs asserted that proximity to the front door of the Courthouse was key to their message because otherwise their intended audience—"people who are going to serve or are in fact serving on juries"—will "very frequently just bypass them" in the designated free speech zone by "walking on one of the sidewalks that is part of the [Restricted Areas]." By contrast, positioning themselves near the front door would allow Plaintiffs "to pass out literature to anyone who wants it" and "if people want to stop and talk about [it], they can then explain to them what the concept of jury nullification is." Thus, according to Plaintiffs, the Order effectively prevented them from reaching their target audience. Finally, the district court accepted the parties' jointly stipulated exhibits, which consisted of a series of images of the Plaza and Restricted Areas, as well as a copy of the Order.

Following the evidentiary hearing, the district court granted Plaintiffs' request for a preliminary injunction. In doing so, the district court relied on Denver's Stipulation that the Plaza was a public forum and the Judicial District's position that resolving the forum status was not necessary because the Order "would satisfy even the strictest test." The district court concluded Plaintiffs had demonstrated a likelihood of success on the merits because, treating the Restricted Areas as public fora, the Order's complete ban on

10

expressive activity was not narrowly tailored to accomplish a significant government interest.

Accordingly, the district court entered a carefully circumscribed preliminary injunction in favor of Plaintiffs. Specifically, the district court enjoined enforcement of Paragraph 1 of the Order against Plaintiffs "to the extent he or she is otherwise lawfully seeking to distribute and/or orally advocate the message contained in [Plaintiffs' pamphlets]" in the Restricted Areas. But the district court expressly left the remainder of the Order in place.

Following entry of the preliminary injunction, the Judicial District moved to stay the injunction pending appeal pursuant to Rule 62(c) of the Federal Rules of Civil Procedure. In its motion to stay, the Judicial District introduced evidence that—subsequent to entry of the preliminary injunction—protesters had "descended on the Courthouse Plaza" and engaged in a pattern of disruptive and inappropriate behavior, including erecting canopies, harassing citizens seeking to enter the Courthouse, damaging the Courthouse landscaping, yelling and taunting court personnel, and posting signs in the planters and on the flagpoles in the Plaza. The Judicial District argued that a stay of the injunction was appropriate because protesters had been "emboldened" by the injunction to violate even the portions of the Order not subject to the injunction, thereby irreparably harming the Judicial District. The district court declined to stay the injunction, finding the Judicial District had not demonstrated a likelihood of success on appeal because the harm identified was not caused by the injunction. The district court reasoned the Judicial District and Denver were free to enforce the Order against the parties engaging in the

11

complained-of disruptive behavior because such behavior was unlawful and not protected by the narrow injunction issued by the court with respect to Plaintiffs' activities only.

The Judicial District now appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), we affirm.

## II.    DISCUSSION

On appeal, the Judicial District raises two arguments. First, it asserts the district court erred when it concluded the Plaintiffs had demonstrated a likelihood of success in establishing the Restricted Areas are public fora. Second, the Judicial District argues the district court incorrectly applied strict scrutiny when evaluating the Order. As a result, the Judicial District asks this court to reverse the district court's entry of the preliminary injunction and remand for further proceedings.

We review the district court's grant of a preliminary injunction for abuse of discretion. *Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 822 (10th Cir. 2014). "A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings." *Id.*

### A.    *Scope of Review*

Before addressing the merits of the parties' arguments, we pause to clarify the scope of our review. The district court granted a narrow preliminary injunction drafted to address Plaintiffs' First Amendment concerns related to their specific expressive activities. Although Plaintiffs asked the district court to prohibit enforcement of the entire Order, the court enjoined only the first paragraph, which imposes a complete ban on First Amendment activities—picketing, pamphleteering, protesting—within the Restricted

Areas. The district court left in place the rest of the Order, including the prohibitions against obstructing Courthouse entrances, erecting structures, and using sound amplification equipment in the Restricted Areas.

The district court further limited the scope of the preliminary injunction by enjoining the first paragraph of the Order only as to Plaintiffs' specific pamphleteering activities. In fact, the court enjoined enforcement of the Order only as to Plaintiffs' distribution and discussion of two specifically identified pamphlets. The Judicial District remains free to enforce the first paragraph of the Order—even against Plaintiffs—for all other First Amendment activities within the Restricted Areas.

Finally, the district court limited the geographic scope of the injunction. Although the Order prohibits First Amendment activity both inside and outside the Courthouse, the district court enjoined enforcement of Paragraph 1 as to Plaintiffs only outside the Courthouse, leaving the entirety of the Order intact within the Courthouse. And the district court did not enjoin enforcement of any part of the Order within those portions of the Restricted Areas dedicated to Courthouse landscaping and security features. Thus, the Order continues to prohibit all expressive activity in the planter boxes or other landscaping and in the gravel security areas. Accordingly, the features of the Restricted Area to which the preliminary injunction applies are limited to (1) the arced walkway running south from Colfax Avenue between the gravel security area (to the west of the walkway) and a raised planter (to the east of the walkway) and ending at the Patio area at

13

the main entrance on the east side of the Courthouse;[2] and (2) the Patio area at the main entrance. [3]

Our task in this appeal is to determine whether the district court abused its discretion when, *based on the record before it at the preliminary injunction hearing*, it issued this narrow, targeted injunction. But the Judicial District asks us to consider events occurring *after* the preliminary injunction hearing to determine whether the district court abused its discretion in issuing the preliminary injunction. Specifically, the Judicial District points to evidence introduced during the Rule 62(c) hearing on the motion to stay the injunction pending appeal, which indicated that following the injunction, protestors had engaged in a series of inappropriate and disruptive behaviors. Some of these behaviors included harassing court personnel seeking to enter the Courthouse, erecting canopies and signs, and trampling Courthouse landscaping. According to the Judicial District, these post-injunction events demonstrate the "concrete concerns" motivating the creation of the Restricted Areas and therefore should have been considered by the district court.

---

[2] As discussed, the Order's prohibition on expressive activities in the planter and gravel security areas were not enjoined by the district court.

[3] The evidence presented about the geographic layout and physical features of the Restricted Area consisted primarily of approximately fifteen photographs. Because the record contains little testimony about the photographs, we rely on our own review of them to describe the Restricted Areas. In particular, it is unclear whether and to what extent the Restricted Areas include the sidewalk running along Fox Street on the west side of the Courthouse. The exhibit appears to highlight some areas of the sidewalk, but counsel for the Judicial District conceded at oral argument that it would be "constitutionally questionable" to prevent speech on a public sidewalk, and then indicated "[t]hat is precisely why the order here does not extend that far." Therefore, we do not treat the Fox Street sidewalk as part of the Restricted Areas for purposes of our analysis.

14

Although we share the Judicial District's concern about the disruptions created by some protestors following issuance of the injunction, these post-injunction events are not relevant to our resolution of this interlocutory appeal for two reasons. First, this evidence relates to events occurring *after* the preliminary injunction issued, and therefore none of it was presented to the district court at the hearing. We will not hold that the district court abused its discretion based on evidence not before it when it ruled. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (noting the general principle, in the context of de novo review of a summary judgment disposition, that we conduct our review "from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties"); *Theriot v. Par. of Jefferson*, 185 F.3d 477, 491 n.26 (5th Cir. 1999) ("An appellate court may not consider . . . facts which were not before the district court at the time of the challenged ruling."). *Cf. Ambus v. Granite Bd. of Educ.*, 975 F.2d 1555, 1569 (10th Cir. 1992) ("[W]e will not reverse the grant of summary judgment . . . based on evidence not before the district court."). Accordingly, our review is limited to the evidence before the district court at the time of the preliminary injunction hearing, and we will not consider post-injunction events.

Second, even if we were to consider the post-decision evidence, it would not alter our analysis. The evidence the Judicial District relies on to demonstrate the negative effects of the preliminary injunction, in fact, does not implicate the injunction at all. As discussed, the preliminary injunction enjoins enforcement of Paragraph 1 of the Order specifically against *Plaintiffs'* pamphleteering activities in certain parts of the Restricted

15

Areas. The district court expressly allowed the Judicial District to continue enforcing the entire Order as to all other parties and all other First Amendment activities in the Restricted Areas. Importantly, the preliminary injunction does not affect the Judicial District's ability to enforce the Order against any protestors, including the Plaintiffs, who engage in disruptive behaviors. For example, the injunction does not prohibit the Judicial District from taking action against protestors who obstruct Courthouse entrances, damage the Courthouse landscaping, or erect structures. *All* of this behavior remained prohibited by the Order after issuance of the injunction. In short, nothing in the preliminary injunction before us on appeal interferes with the Judicial District's or Denver's ability to enforce the Order against *anyone*, including Plaintiffs, engaging in such behavior.

The evidence of post-injunction bad behavior of some protestors may be relevant on remand to a motion to modify the injunction[4] or to the district court's ultimate decision on whether to issue a permanent injunction. But for the purposes of this appeal, we limit our review to the evidence before the district court at the time it issued the preliminary injunction.

## B.    *Abuse of Discretion*

We now turn our attention to the question of whether the district court abused its discretion when it issued the preliminary injunction.

---

[4] As the district court noted, the Judicial District did not move to modify the preliminary injunction based on changed circumstances. *See* Fed. R. Civ. P. 60(b)(5) (allowing a party to obtain relief from a judgment or order when "applying [the judgment or order] prospectively is no longer equitable"); *Horne v. Flores*, 557 U.S. 433, 447 (2009) (noting that under Rule 60(b)(5) "[t]he party seeking relief bears the burden of establishing that changed circumstances warrant relief").

16

> To obtain a preliminary injunction the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest.

*Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013). In the First Amendment context, "the likelihood of success on the merits will often be the determinative factor" because of the seminal importance of the interests at stake. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (internal quotation marks omitted); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

1. **The district court did not abuse its discretion in finding the second, third, and fourth factors weighed in Plaintiffs' favor.**

Here, the district court found the second (irreparable harm), third (balance of equities), and fourth (public interest) factors weighed in Plaintiffs' favor in light of the important First Amendment interests at stake. As an initial matter, the Judicial District has not challenged the district court's determination as to these factors beyond a single footnote in its opening brief stating it had challenged them before the district court. A party's offhand reference to an issue in a footnote, without citation to legal authority or reasoned argument, is insufficient to present the issue for our consideration. *See San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1055–56 (10th Cir. 2011). Accordingly, the Judicial District has waived any challenge to the district court's findings related to the elements of irreparable harm, the balance of equities, and the public interest. But even if the Judicial

17

District had properly challenged these factors on appeal, we would nevertheless affirm the district court's conclusion that they weigh in Plaintiffs' favor.

The Supreme Court has instructed that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). There is no dispute that Plaintiffs' pamphleteering constitutes First Amendment activity. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2536 (2014) (recognizing that one-on-one communication and leafletting are First Amendment-protected activities). And the Judicial District does not dispute that the Order would bar Plaintiffs from engaging in their pamphleteering in the Restricted Areas. Accordingly, the district court did not abuse its discretion in finding that the factor of irreparable harm weighs in Plaintiffs' favor.

The third factor—balance of equities—also tips in Plaintiffs' favor. Before the district court, Plaintiffs proffered testimony that the Order would substantially impair their ability to convey their intended message to their target audience because it would prevent Plaintiffs from approaching potential jurors and engaging in a meaningful discussion of jury nullification. The district court also heard testimony from Mr. Steadman that Plaintiffs' distribution of jury nullification literature and one-on-one discussions with potential jurors did not present a security risk. And the Judicial District presented no evidence that Plaintiffs' activities otherwise interfered with Courthouse functions. On this record, the district court did not abuse its discretion in finding the

18

balance of equities weighed in favor of Plaintiffs. *See Awad*, 670 F.3d at 1132 ("Delayed implementation of a [governmental] measure that does not appear to address any immediate problem will generally not cause material harm, even if the measure were eventually found to be constitutional and enforceable.").

As to whether the preliminary injunction is in the public interest, we agree with the district court that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (internal quotation marks omitted); *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest."). The district court did not abuse its discretion in finding the public interest was served by issuing the preliminary injunction to prevent the violation of Plaintiffs' First Amendment rights.

Thus, we agree the second, third, and fourth factors weigh in Plaintiffs' favor. The only remaining question, then, is whether the district court abused its discretion in finding Plaintiffs demonstrated a likelihood of success on the merits.[5] Specifically, we must determine whether the Order violated Plaintiffs' First Amendment right to distribute jury

---

[5] The Tenth Circuit has modified the preliminary injunction test when the moving party demonstrates that the second, third, and fourth factors "tip strongly" in its favor. *See Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006). "In such situations, the moving party may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Id.* (internal quotation marks omitted). But because we conclude the district court did not abuse its discretion in finding Plaintiffs demonstrated a likelihood of success on the merits, we need not decide whether this more lenient test applies.

19

nullification pamphlets and engage in one-on-one conversations with individuals entering and leaving the Courthouse.

**2.      On this record, the district court did not abuse its discretion in finding Plaintiffs demonstrated a likelihood of success on the merits.**

To demonstrate a violation of their First Amendment rights, Plaintiffs must first establish that their activities are protected by the First Amendment. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). If so, a court must identify whether the challenged restrictions impact a public or nonpublic forum, because that determination dictates the extent to which the government can restrict First Amendment activities within the forum. *See id.* Finally, courts must determine whether the proffered justifications for prohibiting speech in the forum satisfy the requisite standard of review. *Id.* We address each element in turn.

*a.  Plaintiffs' activities are protected by the First Amendment*

The Supreme Court recently reaffirmed that pamphleteering and one-on-one communications are First-Amendment-protected activities. *See McCullen*, 134 S. Ct. at 2536. The Court "observed that one-on-one communication is the most effective, fundamental, and perhaps economical avenue of political discourse" and that "no form of speech is entitled to greater constitutional protection" than leafletting. *Id.* (internal quotation marks and alteration omitted). The Court went on to state, "[w]hen the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden." *Id.* Thus, Plaintiffs' activities are protected by the First Amendment.

20

*b. The district court did not abuse its discretion by assuming for purposes of analysis that the Restricted Areas are public fora*

To properly place the district court's decision in context, we begin with a brief discussion of the significance of forum status to the protection afforded under the First Amendment to public speech on government property. We then review the argument presented by the Judicial District to the district court regarding the forum status of the Restricted Areas here. Because the Judicial District either made a strategic decision to forgo any argument that the Restricted Areas are nonpublic fora, or inadequately presented that argument to the district court, we conclude the argument is waived. As a result, the district court did not abuse its discretion by scrutinizing the Order under public forum analysis for purposes of the preliminary injunction motion.

Turning now to the constitutional restrictions on speech, our analysis is guided by Plaintiffs' wish to engage in First Amendment-protected activity on government property. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799–800. But in some instances, the public may have acquired by tradition or prior permission the right to use government property for expressive purposes. *See id.* at 802. To determine when and to what extent the Government may properly limit expressive activity on its property, the Supreme Court has adopted a range of constitutional protections that varies depending on the nature of the government property, or forum. *Id.* at 800.

21

The Court has identified three types of speech fora: the traditional public forum, the designated public forum, and the nonpublic forum. *Id.* at 802. Traditional public fora are places that by long tradition have been open to public assembly and debate. *See id.*; *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939))). In these traditional public fora, the government's right to "limit expressive activity [is] sharply circumscribed." *Id.* A designated public forum is public property, not constituting a traditional public forum, which the government has intentionally opened to the public for expressive activity. *Id.* The government is not required to retain the open character of the property indefinitely, but "as long as it does so, it is bound by the same standards as apply in a traditional public forum." *Id.* at 46. If the property is not a traditional public forum and it has not been designated as a public forum, it is a nonpublic forum. "Access to a nonpublic forum . . . can be restricted as long as the restrictions are 'reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view.'"[6] *Cornelius*, 473 U.S. at 800 (brackets omitted) (quoting *Perry Educ.*, 460 U.S. at 46).

---

[6] Not relevant to this appeal, the Supreme Court has also recognized that the government can create a "limited public forum" by allowing "selective access to some speakers or some types of speech in a nonpublic forum," while not opening "the property sufficiently to become a designated public forum." *Summum v. Callaghan*, 130 F.3d 906, 916 (10th Cir. 1997) (citing *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829–30 (1995)).

22

Because the nature of the forum dictates the standard of scrutiny with which restrictions on speech are reviewed, courts typically begin the analysis of a challenge to restrictions on speech involving government property by identifying the nature of the forum involved. *See, e.g.*, *Doe v. City of Albuquerque*, 667 F.3d 1111, 1128 (10th Cir. 2012). But the procedural posture of this appeal restricts the scope of our inquiry. That is, we need not determine whether the Restricted Areas are, in fact, public or nonpublic fora to resolve this interlocutory appeal. Rather, our task is to determine whether the district court abused its discretion when it found, based on the evidence and arguments presented, that Plaintiffs had demonstrated a likelihood of success on the merits. *See Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981) ("It is only necessary that plaintiffs establish a reasonable probability of success, and not an 'overwhelming' likelihood of success, in order for a preliminary injunction to issue."). Because the Judicial District waived any argument that the Restricted Areas are nonpublic fora, we conclude the district court did not abuse its discretion by evaluating the Plaintiffs' likelihood of success under the scrutiny applicable to public fora.

To explain our rationale for this conclusion, we track the evolution of the Judicial District's arguments in the district court regarding the forum status of the Restricted Areas. Plaintiffs argued in their motion for preliminary injunction that the entire Plaza, including the Restricted Areas, constitutes a traditional public forum. Denver also stipulated with Plaintiffs that the Plaza is a public forum.

In response to the motion for preliminary injunction, the Judicial District claimed Plaintiffs were unlikely to prevail on the merits of their First Amendment claim because

23

"[i]rrespective of Denver's view of the courthouse plaza, it is not a traditional public forum. And even if it were, the [Order] comes nowhere near banning all expressive activity in that area. To the contrary, it is a reasonable time, place, and manner restriction." But the Judicial District did not then provide any support for its assertion that the Plaza is not a public forum. Rather, it first claimed that Plaintiffs lacked standing to challenge the Order and then continued its argument under the heading, "This Court need not decide whether the plaza is a traditional public forum for the purposes of this proceeding." Under that heading, the Judicial District asserted that the Stipulation between the Plaintiffs and Denver did not bind the Judicial District or the district court and that therefore "[t]he status of the plaza is an open question." But, again, rather than present argument on the correct forum status of the Plaza or ask the district court to reach a contrary conclusion, the Judicial District stated the district court need not identify the precise forum status of the Restricted Areas "because [the Order] would satisfy even the strictest test." That is, the Judicial District claimed that "[e]ven if Plaintiffs were correct that the entire plaza is a traditional public forum," and thus subject to a higher standard of review, the Order was constitutional as a reasonable time, place, and manner restriction. The Judicial District maintained this tactical approach through oral argument on the motion for a preliminary injunction.

After the close of evidence at the hearing on Plaintiffs' motion for a preliminary injunction, the district court attempted to clarify the Judicial District's position:

THE COURT:    In your briefing the Attorney General took the position that it doesn't matter whether the area in question is a public forum or a non-public forum area, because the Attorney General

24

|  |  |
|---|---|
|  | believes that you can establish the grounds necessary under the standards to apply in either case. |
| JUDICIAL DIST.: | To be clear, our position is that this is not a public forum. *However, that is a factually intensive question that I don't think the Court has been presented with sufficient evidence to decide today.* |
| THE COURT: | Well, I have a stipulation from the owner of the property that it is a public forum area. |
| JUDICIAL DIST.: | I understand that. I don't think that binds either [the Judicial District] or this Court. |
| THE COURT: | Well, that's something I need to decide, right? |
| JUDICIAL DIST.: | Not necessarily. |
| THE COURT: | Okay. But here's what I am getting at. *Your position is, whether it's public or non-public, you believe that the . . . Plaza Order . . . is sufficiently narrowly tailored* to meet the concerns of ingress and egress to the courthouse and threat to the public safety. Is that your position? |
| JUDICIAL DIST.: | *Yes*. Our position is that the order satisfies time, place, and manner requirements. . . . |

The discussion then proceeded under the assumption that the Order impacted a public forum and therefore had to be narrowly tailored. Recall that the government has broad discretion to restrict expressive activity in a nonpublic forum, irrespective of whether the restrictions are narrowly tailored. *Perry Educ.*, 460 U.S. at 46. But, as will be discussed in more detail below, even content-neutral restrictions on speech in a public forum—whether a traditional public forum or a designated public forum—must be narrowly tailored to advance a significant government interest. *See id.* at 45–46.

25

Consistent with its acquiescence to the district court's application of a public forum analysis at the preliminary injunction stage, the Judicial District limited its oral argument on the motion for preliminary injunction to the proper definition of "narrowly-tailored." Tellingly, the Judicial District provided no argument relevant to whether the Restricted Area was, in fact, a public forum, or that the restrictions did not have to be narrowly tailored at all because they impacted only nonpublic fora. Instead, the Judicial District conceded that the evidence was insufficient to allow the district court to determine the forum status of the Restricted Areas. But it claimed the district court could proceed to the merits under a public forum analysis nevertheless, because the result would be the same whether the Restricted Areas were public or nonpublic fora. That is, the Judicial District argued the district court could assume for purposes of analysis that the Restricted Areas are public fora. And the district court did as suggested in its Order Granting Motion for Preliminary Injunction.

In the Preliminary Injunction Order's discussion of the likelihood that Plaintiffs will succeed on the merits, the district court discussed forum in a section titled, "Is the Courthouse Plaza a Public Forum?" In this section, the district court considered the significance of the nature of the forum, the disagreement between Denver and the Judicial District on that issue, and the Stipulation between Denver and Plaintiffs that the Restricted Areas are public fora. Relying in part on the Stipulation, the district court concluded Plaintiffs are "likely to prevail in their claim that the Courthouse Plaza is at least a designated public forum, if not a traditional public forum." But the district court also notes "the Second Judicial District has not specifically argued for a finding that the

26

Courthouse Plaza is a nonpublic forum. Rather, it says that 'resolving [the type of forum at issue] is not necessary for the purposes of this proceeding because the [Plaza Order] would satisfy even the strictest test.'"

Our review of the record is consistent with the district court's assessment of the Judicial District's argument. During the briefing and argument to the district court in opposition to Plaintiffs' motion for preliminary injunction, the Judicial District never provided legal argument supporting its conclusory statement that the Restricted Areas are nonpublic fora. As noted, it instead indicated the forum status of the Plaza was an open question the district court need not decide, and further conceded it was a question the district court could not decide based on the evidence presented. In sum, the Judicial District made the strategic decision to accept Plaintiffs' characterization of the Restricted Areas as a public forum for purposes of analysis and to present only an argument that the Order is constitutional under the scrutiny applicable to restrictions of speech in public fora. And the Judicial District maintained that position throughout the district court proceedings.

The Judicial District filed a motion in the district court to stay the injunction pending appeal, in which it stated "courthouse plazas are *not* traditional public fora," and cited, without further analysis, *Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015), a new decision at the time holding the plaza of the Supreme Court building is not a public forum. But again, the Judicial District did not seek a ruling that the Restricted Areas are nonpublic fora or provide reasoned analysis to support such a claim. Consistent with its earlier strategy, the Judicial District argued that "even if the [Courthouse Plaza] were a

27

traditional public forum," the district court applied the wrong level of scrutiny. Significantly, the Judicial District never claimed it could bar or reasonably restrict speech in the Restricted Areas because they were nonpublic fora; it argued the district court had erred because "[s]trict scrutiny applies only to content-*based* restrictions on speech in a *public forum*."

For the first time on appeal, the Judicial District provides substantive argument for the claim that the Restricted Areas are nonpublic fora and, therefore, the district court should have considered only whether the content-neutral restrictions contained in the Order were reasonable. When a party pursues a new legal theory for the first time on appeal, we usually refuse to consider it. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011); *Lone Star Steel Co. v. United Mine Workers of Am.*, 851 F.2d 1239, 1243 (10th Cir. 1988) ("Ordinarily, a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory.").

As noted, the Judicial District was aware of the "open question" with respect to the forum status of the Restricted Areas but made the strategic decision to forgo presenting meaningful argument on this point. In its response brief to Plaintiffs' motion for preliminary injunction filed with the district court, the Judicial District cited three cases in support of its statement that the forum question remains open. But it provided no argument incorporating those decisions into a cogent legal analysis of the Restricted Areas as nonpublic fora. *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (internal quotation marks

28

omitted)). And although forum status is a fact-intensive inquiry, the Judicial District failed to explain how the particular facts here color that analysis. *Cf.* Fed. R. App. P. 28(a)(8)(A) (providing that appellant's opening brief must contain an argument section that includes "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

Thus, the Judicial District has waived this issue, at least for purposes of our review of the preliminary injunction order. *Richison*, 634 F.3d at 1127 (explaining that if a party intentionally chooses not to pursue an argument before the district court, "we usually deem it waived and refuse to consider it").[7] And the forum status issue is not properly before us even if we generously conclude the Judicial District presented alternative arguments to the district court that (1) the Restricted Areas are not public fora; or (2) even if the Restricted Areas are public fora, the Order can survive the applicable level of scrutiny. Although the Judicial District presented cogent legal argument on the second issue, it failed to present reasoned argument on the first to the district court. *See Ark Initiative v. U.S. Forest Serv.*, 660 F.3d 1256, 1263 (10th Cir. 2011) (holding that the

---

[7] Even if this argument had been merely forfeited, it would nevertheless be an inappropriate basis for reversal because the Judicial District has not argued plain error. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("And the failure to do so—the failure to argue for plain error and its application on appeal—surely marks the end of the road for an argument for reversal not first presented to the district court."). Nor are we inclined to exercise our discretion to consider the forum status issue despite the failure to raise it to the district court because we agree with the Judicial District that the preliminary injunction record is inadequate for that purpose. *Cf. Cox v. Glanz*, 800 F.3d 1231, 1244–45 (10th Cir. 2015) (exercising discretion to consider forfeited argument on "clearly established" prong of qualified immunity).

"scant discussion" of an issue in the district court "appear[ed] as an afterthought, and [did] not meet the standard for preserving an issue for review").

Our conclusion that the Judicial District failed to adequately present this issue to the district court is further supported by the district court's view that "the Second Judicial District ha[d] not specifically argued for a finding that the Courthouse Plaza is a nonpublic forum." *Id.* ("Not surprisingly, the district court never addressed" the issue.). Accordingly, the argument that the Restricted Areas are nonpublic fora was waived either by the Judicial District's strategic decision not to present it, or by the Judicial District's failure to adequately brief the issue. As such, the district court's application of a public forum analysis is not a legitimate ground on which to reverse the preliminary injunction order.

We now address the only other challenge the Judicial District makes to the preliminary injunction: that the district court abused its discretion by applying the wrong test, even if the Restricted Areas are public fora.

c. *The district court did not apply the wrong standard to the content-neutral restrictions imposed by the Order*

Having determined the district court did not abuse its discretion by treating the Restricted Areas as public fora for purposes of analysis, we next consider whether the district court abused its discretion when it found Plaintiffs had demonstrated a likelihood of success on the question of whether the Order violated their constitutional rights under

30

the relevant First Amendment standards.[8] In a public forum, the government cannot ban all expressive activity. *Perry Educ.*, 460 U.S. at 45. But even in a public forum, the government can restrict speech through "content-neutral time, place, and manner restrictions that: (a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication." *Doe*, 667 F.3d at 1130–31. *Content-based* restrictions, however, "must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Summum*, 555 U.S. at 469.

The Judicial District argues the district court abused its discretion by applying an incorrect legal standard. Specifically, the Judicial District contends the district court applied the stringent strict scrutiny analysis reserved for content-based restrictions. And because the Order imposes only content-neutral restrictions, the Judicial District claims this was an abuse of discretion. Although we agree the restrictions are content-neutral, we are not convinced the district court applied the more stringent standard applicable to content-based restrictions.

The district court explained that under the relevant standard, "[t]he state may . . . enforce regulations of the time, place, and manner of expression which [1] are content-neutral, [2] are narrowly tailored to serve a significant government interest, and [3] leave open ample alternative channels of communication." On its face, then, the district court

---

[8] "Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009). Thus, our analysis does not turn on whether the Restricted Areas are considered traditional or designated public fora.

appears to have invoked the correct legal standard. *Cf. Doe*, 667 F.3d at 1130–31 (same). Nevertheless, the Judicial District argues that in considering whether the restrictions are "narrowly tailored," the district court inappropriately applied the more demanding standard applicable to content-based regulations.

The term "narrowly tailored" appears in the tests for both content-based and content-neutral regulations on speech. *See Doe*, 667 F.3d at 1130–31 (indicating a *content-neutral* regulation must be "narrowly tailored" to advance a *significant* government interest); *Pleasant Grove*, 555 U.S. at 469 (stating that *content-based* restrictions "must be narrowly tailored to serve a *compelling* government interest") (emphasis added)). And, as the Judicial District correctly notes, there are subtle differences in the way courts apply the concept of narrow tailoring in the two contexts. For the purposes of a content-neutral regulation, "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further the government's legitimate interests." *Wells v. City & Cty. of Denver*, 257 F.3d 1132, 1148 (10th Cir. 2001) (ellipsis and internal quotation marks omitted). In contrast, a content-based restriction is narrowly tailored only if it is the least restrictive means of achieving the government's compelling objective. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

According to the Judicial District, the district court considered alternatives to the Order that might have been employed to achieve the Judicial District's objectives, and

32

such consideration proves the district court applied the "least restrictive means" standard. In the Judicial District's view, any inquiry into alternative means of achieving the government objective is inappropriate where, like here, the restrictions are content-neutral, rather than content-based, and thus not subject to the least restrictive alternative form of narrow tailoring. We disagree.

The Supreme Court has not discouraged courts from considering alternative approaches to achieving the government's goals when determining whether a content-neutral regulation is narrowly tailored to advance a significant government interest. Although the Court has held that a content-neutral regulation "need not be the least restrictive or least intrusive means of serving the government's interests," it has also explained that "the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *McCullen*, 134 S. Ct. at 2535 (internal quotation marks omitted). And when considering content-neutral regulations, the Court itself has examined possible alternative approaches to achieving the government's objective to determine whether the government's chosen approach burdens substantially more speech than necessary. *Id.* at 2537–39. That is, the government may not "forgo[] options that could serve its interests just as well," if those options would avoid "substantially burdening the kind of speech in which [Plaintiffs'] wish to engage." *Id.* at 2537; *id.* at 2539 ("The point is not that [the government] must enact all or even any of the proposed [alternative approaches]. The point is instead that the [government] has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and

debate."). Thus, "[t]o meet the requirement of narrow tailoring [in the context of content-neutral regulations], the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 2540.

As a result, we cannot conclude the district court applied the wrong legal standard merely because it considered whether the Judicial District had options other than the complete ban on speech contained in Paragraph 1 of the Order that would equally serve its interests. We now turn our attention to whether, under the standard applicable to content-neutral regulations in a public forum, the district court abused its discretion when it found Plaintiffs had demonstrated a likelihood of success on the question of whether the Order survives constitutional scrutiny.

> ### d. *The district court did not abuse its discretion by concluding that Plaintiffs were likely to succeed on the merits*

As discussed, for purposes of the preliminary injunction analysis, the Judicial District acquiesced in the district court's acceptance of Plaintiffs' characterization, and Denver's Stipulation, that the Restricted Areas are public fora. Under that assumption, we can easily conclude the district court did not abuse its discretion in finding Plaintiffs were likely to succeed on their claim that a complete ban of their expressive activities violates the First Amendment. Our resolution of this issue is informed by the Supreme Court's recent decision in *McCullen*, which is highly analogous.

In *McCullen*, the Supreme Court considered the constitutionality of a state law creating thirty-five-foot buffer zones around the entrances of facilities where abortions

34

are performed. *Id.* at 2525. The *McCullen* plaintiffs wished to approach and talk to women outside such facilities—to engage in "sidewalk counseling"—in an attempt to dissuade the women from obtaining abortions. *Id.* at 2527. The buffer zones forced the *McCullen* plaintiffs away from their preferred positions outside the clinics' entrances, thereby hampering their sidewalk counseling efforts. *Id.* at 2527–28. The *McCullen* plaintiffs brought suit, arguing the buffer zones restricted their First Amendment rights and seeking to enjoin enforcement of the statute creating the buffer zones. *Id.* at 2528. After the First Circuit upheld the statute as a reasonable content-neutral time, place, and manner restriction, the Supreme Court granted certiorari. *Id.*

The Court began its analysis by recognizing that the buffer-zone statute operated to restrict speech in traditional public fora: streets and sidewalks. *Id.* at 2529. It then held the buffer-zone statute was a content-neutral restriction because violations of the act depended not on what the plaintiffs said, but on where they said it. *Id.* at 2531 ("Indeed, petitioners can violate the Act merely by standing in a buffer zone, without displaying a sign or uttering a word."). The Court then proceeded to apply the test for content-neutral restrictions in a public forum, assessing whether the buffer-zone statute was "narrowly tailored to serve a significant governmental interest." *Id.* at 2534. Because the plaintiffs had not challenged the significance of the government's asserted interests, the Court's analysis largely focused on the question of whether the statute was narrowly tailored to serve that interest.

The Court noted the buffer zones placed serious burdens on the plaintiffs' speech activities. *Id.* at 2535. Specifically, by preventing the plaintiffs from engaging in quiet,

35

one-on-one conversations about abortion and distributing literature, the buffer zones "operate[d] to deprive petitioners of their two primary methods of communicating with patients." *Id.* at 2536. Although the First Amendment does not guarantee a right to any particular form of speech, the Supreme Court explained that some forms of speech—one-on-one conversation and leafletting on public sidewalks—"have historically been more closely associated with the transmission of ideas than others." *Id.* The Court held that "[w]hen the government makes it more difficult to engage in [one-on-one communication and leafletting], it imposes an especially significant First Amendment burden." *Id.*

The Court also rejected the idea that the buffer zones were constitutional because they left ample alternative channels for communication. *Id.* at 2536–37. In *McCullen*, the size of the buffer zone made it difficult to distinguish persons headed to the clinic from passersby "in time to initiate a conversation before they enter[ed] the buffer zone." *Id.* at 2535. As a result, the plaintiffs were often forced to raise their voices from outside the buffer zone once they identified the clinic patients, thereby forcing a mode of communication contrary to their compassionate message and preventing them from distributing pamphlets. *Id.* at 2535-36. Where the plaintiffs wished to engage in quiet conversations with women seeking abortions and not in noisy protest speech, the Court held it was "no answer to say that petitioners can still be 'seen and heard' by women within the buffer zones." *Id.* at 2537. Instead, the Supreme Court concluded the thirty-five foot buffer zones had "effectively stifled petitioners' message" by prohibiting the plaintiffs' chosen means of communication. *Id.*

Finally, the Court held the buffer zones burdened substantially more speech than necessary to achieve the state's asserted interests in public safety, preventing harassment of women and clinic staff seeking entrance to clinics, and preventing deliberate obstruction of clinic entrances. *Id.* Although the Court acknowledged the importance of these interests, it determined the state's chosen method of achieving them—categorically excluding most individuals from the buffer zones—was not narrowly tailored. *Id.* at 2537–41. That is, the Court held the government had not demonstrated "that alternative measures that burden substantially less speech would fail to achieve the government's interests." *Id.* at 2540. In so doing, the Court expressly rejected the argument that the government could choose a particular means of achieving its interests merely because that method was easier to administer. *Id.*

Here, the Order imposes substantially similar restrictions on Plaintiffs' First Amendment activities as the buffer-zone statute did in *McCullen*. Specifically, the Order imposes a categorical ban on First Amendment activity within the Restricted Areas. This ban effectively destroys Plaintiffs' ability to engage in one-on-one communication and leafletting within the Restricted Areas. And the record is silent on whether Plaintiff could adequately identify and thereby engage in their preferred method of communication before the public entered the Restricted Areas. Where the district court's preliminary injunction analysis was based on a public forum analysis and the record does not contain facts to distinguish *McCullen*, we cannot conclude that the district court abused its discretion in finding that the Plaintiffs are likely to succeed on the merits of their First Amendment claim.

37

Moreover, the Judicial District's asserted interests in banning First Amendment activity in the Restricted Areas are largely identical to the government interests asserted in *McCullen*: unhindered ingress and egress and public safety. *See id.* We agree these interests are legitimate. But on this record at least, the district court did not abuse its discretion in concluding the means chosen to achieve those interests—a total ban on expressive activity—is not narrowly tailored, as even content-neutral regulations in a public forum must be.[9]

In summary, the district court did not abuse its discretion by analyzing the issues at the preliminary injunction stage as if the Restricted Areas were public fora, or by considering alternative means of achieving the governmental interests in determining whether the Order is narrowly tailored to serve a significant government interest. Similarly, the district court did not abuse its discretion by finding Plaintiffs were likely to prevail on their claim that the complete prohibition of Plaintiffs' plans to distribute pamphlets to people in a public forum is unconstitutional. *See United States v. Apel*, __ U.S. __, 134 S. Ct. 1144, 1154–55 (2014) (Ginsburg, J., concurring) ("When the Government permits the public onto part of its property, in either a traditional or designated public forum, its 'ability to permissibly restrict expressive conduct is very limited.'" (quoting *United States v. Grace*, 461 U.S. 171, 177 (1983)).

---

[9] This is not to say that the Judicial District cannot impose content-neutral time, place, and manner restrictions that are narrowly-tailored to advance the significant interests it identifies. Indeed, several of the provisions contained in the Order were not enjoined by the district court. As one example, paragraph 4 of the Order prohibits the use of sound amplification equipment. This type of content-neutral restriction has long been upheld. *See Ward v. Rock Against Racism*, 491 U.S. 781, 796–97 (1989).

Nevertheless, because the question of the forum status of the Restricted Areas will remain central to the district court's permanent injunction analysis on remand, we now address principles relevant to the resolution of this issue. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1142 n.15 (10th Cir. 2010) ("[I]t is proper to . . . decide questions of law raised in this appeal that are certain to arise again . . . in order to guide the district court on remand."). In doing so, we express no opinion as to the merits of that question.

## C.      *Issues on Remand*

To determine whether a permanent injunction should be granted, the district court must reach a final decision on the First Amendment issues in this case. Because the relevant First Amendment test varies according to the nature of the forum involved and because the Judicial District will presumably contest Plaintiffs' characterization of the Restricted Areas as public fora, the district court is required to first determine the forum status of the Restricted Areas. In resolving this question, the parties must present evidence, and the district court must enter factual findings supporting its conclusion, that each of the Restricted Areas constitutes a traditional public forum, a designated public forum, or a nonpublic forum. *See, e.g.*, *Huminski v. Corsones*, 396 F.3d 53, 90–92 (2d Cir. 2004) (separately considering the forum status of state courthouses, court lands/grounds, and parking lots); *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 966–68 (9th Cir. 2002) (concluding plaintiffs were likely to succeed on First Amendment challenge to rule restricting expressive clothing in municipal complex, including courtrooms, because the rule "does not differentiate between courtrooms and other public areas"), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7

39

(2008); *United States v. Gilbert*, 920 F.2d 878, 884 (11th Cir. 1991) (*Gilbert I*) (holding portions of courthouse grounds were designated public fora, while other parts of the grounds were nonpublic fora). We summarize the relevant precedent on these issues now in an attempt to aid the district court and the parties in this task on remand. In addition, we provide some limited guidance to the district court and the parties on the tension between the Judicial District and Denver over the appropriate use of the Restricted Areas.

**1.      Traditional Public Fora**

The Supreme Court has long recognized "that public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be public forums." *United States v. Grace*, 461 U.S. 171, 177 (1983) (internal quotation marks omitted); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (identifying as "quintessential" public fora those spaces that "time out of mind[] have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"). Here, the Restricted Areas include the arced walkway that runs from the corner of Elati Street and Colfax Avenue in a curved path across the front of the Courthouse to the Patio in front of the main entrance to the Courthouse. The inclusion of this area raises at least a question concerning its status as traditional a public forum.

The Supreme Court has also cautioned, however, that not all streets and sidewalks are traditional public fora. *See United States v. Kokinda*, 497 U.S. 720, 727 (1990) (discussing a postal sidewalk "constructed solely to provide for the passage of individuals engaged in postal business" from the parking area to the post office door); *Greer v.*

*Spock*, 424 U.S. 828, 835–37 (1976) (speech restrictions on a military reservation that contained streets and sidewalks). Instead, the particular characteristics of a sidewalk are highly relevant to the inquiry. *See Grace*, 461 U.S. at 179–80. "The mere physical characteristics of the property cannot dictate" the outcome of the forum analysis. *Kokinda*, 497 U.S. at 727. Rather, "the location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum." *Id.* at 728–29.

The Supreme Court's discussion in *Grace* is likely to be of particular relevance on remand. In *Grace*, the Court considered whether a federal statute prohibiting expressive activities on the Supreme Court's grounds could be constitutionally applied to the adjacent public sidewalks. 461 U.S. at 172–73. The Court found the public sidewalks along the perimeter of the grounds were physically indistinguishable from other public sidewalks in Washington, D.C. *Id.* at 179. "There is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id.* at 180. *See also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992) ("[W]e have recognized that the location of property also has a bearing [on whether it is a traditional public forum] because separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction."). In the absence of some physical distinction between typical public sidewalks and the sidewalks making up the perimeter of the Court grounds, the Court in *Grace* held the perimeter sidewalks were traditional public fora, subject only to

41

those restrictions normally allowed in such spaces. 461 U.S. at 180. Thus, on remand here, the district court must determine whether the evidence supports a finding that the arced walkway is physically distinguishable from other public sidewalks.

But the physical similarity to public sidewalks is not alone determinative of these sidewalks' forum status. In *Kokinda*, the Supreme Court held that a sidewalk owned by and in front of a United States Post Office was not a traditional public forum, despite the fact that it was physically identical to a public sidewalk across the parking lot from the post office entrance. 497 U.S. at 727. The Court reasoned the post office sidewalk did not share the characteristics of a sidewalk open to the public at large. Although the public sidewalk formed a public passageway that served as a general thoroughfare, in contrast, "the postal sidewalk was constructed solely to provide for the passage of individuals engaged in postal business." *Id.* As a result, the Court held the postal sidewalk was not a traditional public forum. *Id.* at 729–30. Accordingly, the evidence and findings of fact on remand should be focused on the physical characteristics and the intended and actual use of any sidewalks included in the Restricted Areas.

Importantly, the mere fact a sidewalk abuts a courthouse or its grounds is not determinative of the forum status of the sidewalk.[10] The *Grace* Court expressly rejected

_____

[10] The cases relied on by the Judicial District do not support the blanket proposition that all courthouse grounds are automatically nonpublic fora merely because they physically abut a courthouse. Rather, these cases first conclude the grounds are not a traditional public forum and then carefully consider the physical characteristics of the government property, as well as the prior use of that property for expressive activities, to determine its forum status. *See Huminski v. Corsones*, 396 F.3d 53, 90–92 (2d Cir. 2004) (holding courthouses were nonpublic fora where buildings housing the courts had not been traditionally open to the public for expressive activities and such activities inside the

42

the idea that a traditional public forum could be transformed into a nonpublic forum merely because of its physical proximity to government property. 461 U.S. at 180. The Court stated

> [t]raditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression. Nor may the government transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property.

*Id.*; *see also* Rodney A. Smolla, 1 Smolla & Nimmer on Freedom of Speech § 8:32 ("With the development of modern public forum doctrine, courts increasingly have come to recognize that they are not immune from the rules set down for other public property."). In *Grace*, the Supreme Court concluded, "[w]e are convinced . . . that the [statute], which totally bans the specified communicative activity on the public sidewalks around the Court grounds, cannot be justified as a reasonable place restriction primarily because it has an insufficient nexus with any of the public interests [asserted]." 461 U.S. at 181. Similarly, the fact that the arced walkway abuts the Courthouse here is not determinative alone of its forum status.

---

courthouse would likely be incompatible with the purposes the courthouse serves); *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 966 (9th Cir. 2002) (holding civil complex, including courts and public offices had not "by long tradition or by government fiat" been open to public expression and agreeing with parties that it was a nonpublic forum), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). *See also United States v. Gilbert* (*Gilbert I*), 920 F.2d 878, 884–85 (11th Cir. 1991) (considering prior expressive activities on different areas of court grounds and holding some portions had been designated as public fora, while other parts of the grounds were nonpublic fora).

43

The district court will also be required to decide the forum status of the Patio before it can apply the proper standard to restrictions on expressive activity in that Restricted Area. The D.C. Circuit recently applied the Court's forum analysis in *Grace* to the question of whether the plaza in front of the Supreme Court was a traditional public forum. *See Hodge v. Talkin*, 799 F.3d 1145, 1158 (D.C. Cir. 2015), *petition for cert. filed*, 84 U.S.L.W. 3388 (U.S. Jan. 4, 2016) (No. 15-863). The court's analysis focused on the plaza's physical characteristics, emphasizing the architectural integration of the plaza with the Supreme Court building itself, as well as the physical separation between the plaza and the perimeter sidewalks. *Id.* at 1158–59. In particular, the D.C. Circuit relied on evidence that the Supreme Court plaza is elevated from the public sidewalk by a set of marble steps that contrast with the public sidewalk, but match the steps leading to the entrance of the Supreme Court building. It also relied on evidence that the plaza is surrounded by a low wall that matches the wall surrounding the Supreme Court building. *Id.* at 1158. According to the court, a visitor would be on notice that the pathway to the Supreme Court begins on the plaza. *Id.* Because the physical characteristics of the plaza indicated an intentional separation from the surrounding sidewalks and because the plaza had not traditionally been a space open for expressive activities, the D.C. Circuit held the Supreme Court plaza was a nonpublic forum. *Id.* at 1159–60.

Here, the parties should present evidence and the district court should make findings about the physical characteristics of the arced walkway and Patio, with attention to the ways in which each is distinguished from public sidewalks and the public areas of the Plaza. Specifically, the district court should consider whether it would be apparent to

44

a visitor that by entering the Patio he is entering an enclave connected with the Courthouse and whether the use of the arced walkway is limited to courthouse ingress and egress.

## 2.    Designated Public Fora

If the district court finds that one or more of the Restricted Areas is not a traditional public forum, it must next consider whether the Restricted Area has been nevertheless designated as public fora. The Supreme Court has explained that "a government entity may create 'a designated public forum' if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (holding that placement of certain privately donated permanent monuments in public park while rejecting others constituted government, not public, speech). To create a designated public forum, "the government must make an affirmative choice to open up its property for use as a public forum." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 206 (2003) (holding that library's provision of internet access did not open a designated public forum, but was offered as a technological extension of its book collection). The Court has further cautioned that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985). *See also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, ___ U.S. ___, 135 S. Ct. 2239, 2249–50 (2015) (holding that Texas did not intentionally open its license plates to public discourse). Thus, the government's

intent is the focus of this inquiry. *See Cornelius*, 473 U.S. at 802; *see also Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 279 (2d Cir. 1997) ("Governmental intent is said to be the 'touchstone' of forum analysis."), *as corrected and reported at* 1997 U.S. App. LEXIS 40571, *15 (March 25, 1998).

The Supreme Court has further instructed that it "will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will [it] infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Cornelius*, 473 U.S. at 803. If the "principal function of the property would be disrupted by expressive activity," the Supreme Court is "particularly reluctant" to conclude the government designated it as a public forum. *Id.* at 804. Consequently, prohibitions on speech within a courthouse have been routinely upheld.[11] *See, e.g.*, *Hodge*, 799 F.3d at 1158 (upholding statute banning expressive activities within Supreme Court building); *Mezibov v. Allen*, 411 F.3d 712, 718 (6th Cir. 2005) ("The courtroom is a nonpublic forum."); *Huminski*, 396 F.3d at 91 (collecting cases and holding that the interior of a courthouse is not a public forum); *Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir. 1998) ("The lobby of the courthouse is not a traditional public forum or a designated public forum, not a place open to the public for the presentation of views. No one can hold a political rally in the lobby of a federal courthouse."); *Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997) (holding that courtroom is a nonpublic forum).

---

[11] The preliminary injunction here does not enjoin the Order's restrictions on speech within the Courthouse.

46

Under facts similar to those here, the Seventh Circuit held the plaintiffs had no First Amendment right to distribute jury nullification pamphlets *in the lobby* of the county courthouse. *Braun v. Baldwin*, 346 F.3d 761, 764 (7th Cir. 2003) ("[Plaintiffs] have no greater right than a criminal defendant's lawyer to tell jurors *in the courthouse* to disobey the judge's instructions." (emphasis added)). *See also United States v. Ogle*, 613 F.2d 233 (10th Cir. 1979) (upholding conviction for jury tampering where the defendant, who did not raise a First Amendment defense, attempted to have jury nullification literature delivered to a juror in a pending case).

Although there is little doubt the interior of a courthouse is a nonpublic forum, the forum status of a courthouse's exterior is dependent upon the unique facts involved. *Compare Grace*, 461 U.S. at 182 (acknowledging "necessity to protect persons and property or to maintain proper order and decorum within the Supreme Court grounds," but striking as unconstitutional a ban on expressive activities on abutting sidewalks), *with Cox v. Louisiana*, 379 U.S. 559, 562–64, 572–74 (1965) (upholding statute prohibiting demonstration outside a courthouse intended to affect the outcome of pending criminal charges, but reversing defendant's conviction pursuant to the statute under the circumstances). In determining whether the government "intended to designate a place not traditionally open to assembly and debate as a public forum," the Supreme Court "has looked to the policy and practice of the government and to the nature of the property and its compatibility with expressive activity." *Walker*, 135 S. Ct. at 2250 (internal quotation marks omitted).

Applying these principles, the Eleventh Circuit reached contrary conclusions regarding different portions of the grounds of a federal building housing a federal district court and federal agencies. *Gilbert I*, 902 F.2d at 884. In *Gilbert I*, the plaintiff challenged an injunction prohibiting him from using the federal building as his home and from engaging in certain expressive activities in and around the building. The ground level of the federal building included an interior lobby and, outside the lobby doors, a covered portico leading to an uncovered plaza. *Id.* at 880–81. Because demonstrations had occurred frequently on the uncovered plaza, the Eleventh Circuit held the uncovered plaza had been designated as a public forum. In contrast, it determined the covered portico area was not a public forum. In reaching that conclusion, the court relied in part on the district court's finding that the Government Services Agency (GSA) had an unwritten policy of excluding demonstrators from the covered portico. Although there was evidence demonstrators had occasionally used the portico during protest activities, the Eleventh Circuit relied on the district court's finding that these were "isolated instances of undiscovered violations" of the GSA policy and not the intentional "opening of a nontraditional forum for public discourse."[12] *Id.* at 884–85.

---

[12] After the Eleventh Circuit issued this decision, an unrelated security issue caused the GSA to place a row of planters across the uncovered plaza and to issue a statement limiting the public forum to the area between the planters and the public street. Mr. Gilbert again sued and the circuit court upheld the district court's ruling that the GSA had effectively withdrawn the area between the planters and the building previously designated as a public forum. *See United States v. Gilbert* (*Gilbert III*), 130 F.3d 1458, 1461 (11th Cir. 1997) ("The government is not required to retain indefinitely the open character of a facility."). Between *Gilbert I* and *Gilbert III*, the Eleventh Circuit upheld Mr. Gilbert's conviction for obstructing the entrance to the federal building. *United States v. Gilbert* (*Gilbert II*), 47 F.3d 1116, 1117 (11th Cir. 1995).

As the decision in *Gilbert I* demonstrates, the issue of whether an area associated with a courthouse has been designated as a public or nonpublic forum is highly dependent on the evidence of the government's intent to open the area to public speech. That intent can be established by the government's policy statements,[13] affirmative actions by the government to designate the area as a public forum,[14] stipulation,[15] the compatibility of expressive activity with the principal function of the property,[16] and whether and the frequency with which public speech has been permitted in the forum.[17] To avoid post hoc

---

[13] *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1276-77 (10th Cir. 1996) (relying on senior citizen center policies to determine forum status of senior centers); *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991) (relying on county charter and local law as indicia of county's intent to dedicate coliseum to a broad array of public and expressive purposes); *Gilbert I*, 920 F.2d at 884 (relying on unwritten GSA policy banning demonstrations from the covered portico).

[14] *Church on the Rock*, 84 F.3d at 1278 (holding that senior centers were designated as public fora because the city had "permitted lectures and classes on a broad range of subjects by both members and non-members"); *Huminski*, 396 F.3d at 91 (holding courthouse parking lot is not a public forum because there was no evidence the government did anything to designate it as such).

[15] *Grider v. Abramson*, 180 F.3d 739, 748 n.11 (6th Cir. 1999) (relying on stipulation of the parties that courthouse steps are a public forum).

[16] *Paulsen*, 925 F.3d at 70 (holding that coliseum grounds are a public forum, in part, because the property can accommodate a wide variety of expressive activity without threatening the government function of the facility); *Greer v. Spock*, 424 U.S. 828, 835–37 (1976) (holding military reservation is not a public forum); *Adderley v. Florida*, 385 U.S. 39, 47 (1966) (same as to jailhouse).

[17] *Widmar v. Vincent*, 454 U.S. 263, 267-68 (1981) (holding university's policy of accommodating student meetings created a forum generally open for student use); *Paulsen,* 925 F.3d at 70 ("The grounds of the Coliseum have been used for parades, political rallies and speeches, religious weddings and circuses. . . . Routinely, banners have been displayed by patrons . . . . Significantly, . . . many groups, including war veterans, the Christian Joy Fellowship and the Salvation Army, were regularly permitted to solicit contributions or distribute literature."); *Gilbert I*, 920 F.2d at 884 (holding that unenclosed plaza of a federal building that houses courtrooms has been opened by the government as a public forum because "[d]emonstrations occur there on a frequent

justification for a desire to suppress a particular message, courts have considered the government's statement of policy in light of the government's actual practice. *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144, 1153–54 (7th Cir. 1995) ("[A] court must examine the actual policy—as gleaned from the consistent practice with regard to various speakers—to determine whether a state intended to create a designated public forum."); *Hays Cty. Guardian v. Supple*, 969 F.2d 111, 117–18 (5th Cir. 1992) ("[T]he government's policy is indicated by its consistent practice, not each exceptional regulation that departs from the consistent practice."). Accordingly, forum status is an inherently factual inquiry about the government's intent and the surrounding circumstances that requires the district court to make detailed factual findings. *See Stewart v. D. C. Armory Bd.*, 863 F.2d 1013, 1018 (D.C. Cir. 1988) (holding that "identifying the government's intent . . . raises inherently factual issues that cannot be resolved on a Rule 12(b)(6) motion"); *Air Line Pilots*, 45 F.3d at 1154 (same). And the ultimate question is whether the facts indicate the government intended to open a nontraditional forum to expressive activity. *See Cornelius*, 473 U.S. at 802 ("The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.").

### 3.    Disagreement Over Opening the Restricted Areas as Public Fora

Here, the issue of the government's intent is complicated by the disagreement between Denver and the Judicial District about the forum status of the Restricted Areas.

---

basis," but holding covered portico was not opened as a public forum because occasional demonstrations there were undetected violations of GSA policy).

According to Denver, it intended to and did open all areas of the Plaza, including those within the Restricted Areas, to the public for expressive activity. In fact, Denver (one of the Defendants) entered into a Stipulation to this effect with Plaintiffs. *Cf. Grider v. Abramson*, 180 F.3d 739, 748 n.11 (6th Cir. 1999) (noting that parties had stipulated that courthouse steps are a public forum). In contrast, the Judicial District argues Denver's Stipulation that the entire Plaza is a public forum cannot control the status of the Restricted Areas because Colorado law vests the judicial branch with inherent authority to regulate state courthouses. As such, the Judicial District asserts that its intent—not Denver's—should control the forum status of the Restricted Areas.

This argument between Defendants raises difficult and novel questions about the intersection between a government property owner's power to designate its property as a public forum and the rights of the occupant of the government property—in this case another governmental entity—to use that property without interference. The parties have not directed us to any authority addressing the question of whose intent controls when two governmental entities disagree about the status of the same forum, and our own research has not revealed any decision precisely on point. But a review of the evolution of the Supreme Court's doctrine on speech forums reveals some fundamental principles that may guide resolution of this difficult question.

The Supreme Court has not always recognized a First Amendment right of the public to use publicly owned property for expressive purposes. Indeed, the Court's early jurisprudence recognized the absolute right of the government to exclude the public from using its property. *See Davis v. Massachusetts*, 167 U.S. 43, 46–47 (1897); *see also*

Geoffrey R. Stone, *Fora Americana: Speech in Public Places*, 1974 Sup. Ct. Rev. 233, 236–37 (discussing the Supreme Court's early forum jurisprudence). In *Davis*, the Court considered a First Amendment challenge to a Boston city ordinance forbidding "any public address" on public property "except in accordance with a permit from the mayor." 167 U.S. at 44. The Supreme Judicial Court of Massachusetts had affirmed a preacher's conviction for violating the ordinance by preaching on Boston Common without first obtaining a permit from the mayor, stating "[f]or the Legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house." *Id.* at 47 (quoting *Commonwealth v. Davis*, 39 N.E. 113, 113 (Mass. 1895) (Holmes, J.)). The Supreme Court unanimously affirmed, concluding that "[t]he right to absolutely exclude all right to use necessarily includes the authority to determine under what circumstances such use may be availed of, as the greater power contains the lesser." *Id.* at 48. Under the Supreme Court's jurisprudence at the time, the government—as the owner of public property—retained an absolute right to exclude the public from that property, just as any private property owner would have the right to exclude others. *See* Stone, *supra*, at 237 ("[T]he state possessed the power absolutely to prohibit the exercise of First Amendment rights of speech on public property simply by asserting the prerogatives traditionally associated with the private ownership of land. The complex and difficult problem of the public forum had been 'solved' by resort to common law concepts of private property.").

Later, the Supreme Court revisited the question of the public's use of government property for expressive purposes and again relied on traditional notions of private property ownership. *See Hague v. Comm. for Indus. Org.*, 307 U.S. 496 (1939). In *Hague*, the Court considered the constitutionality of city ordinances prohibiting all public meetings and leafletting in streets and other public places without a permit. *Id.* at 501–03. Departing from its analysis in *Davis*, Justice Roberts, writing for a plurality of the Court, stated:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Id.* at 515–16. Justice Roberts's position accepted the underlying premise of *Davis*—that the owner of government property enjoyed the same prerogatives as any private property owner—but then extended that premise to predicate a "public forum right upon established common law notions of adverse possession and public trust." Stone, *supra*, at 238. *See also* Harry Kalven, Jr., *The Concept of the Public Forum:* Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 13 (describing Justice Roberts's analysis in *Hague* as establishing "a kind of First-Amendment easement" in which the public, through long use and tradition, has acquired a right to use certain types of public property for First Amendment purposes).

Although Justice Roberts spoke only for a plurality of the *Hague* Court, his formulation has since been accepted by the Supreme Court as the prevailing rationale underlying the concept of traditional public fora. *See, e.g.*, *Perry Educ.*, 460 U.S. at 45 (defining traditional public fora by adopting Justice Roberts's "time out of mind" description). Even in the context of a traditional public forum in which the government property owner's power to exclude and curtail use is sharply circumscribed, the underlying rationale is premised on traditional notions of private property ownership. Indeed, the government's power to control speech in a traditional public forum is circumscribed precisely *because* the public has, through the extent and nature of its use of these types of government property, acquired, in effect, a "speech easement" that the government property owner must now honor.

The Supreme Court has continued to rely on traditional notions of property ownership to describe the government's ability to control the use of its property. For example, the Supreme Court has recognized that the government, "*no less than a private owner of property*, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Greer*, 424 U.S. at 836 (emphasis added). This includes the ability to designate portions of government property for expressive purposes. *See Perry Educ.*, 460 U.S. at 45. But the underlying rationale of a designated public forum is that the governmental entity with control over the property can decide whether and to what extent to open nontraditional fora to public speech. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 679 (2010) ("[I]n a progression of cases, this Court has employed forum analysis to determine when

a governmental entity, in *regulating property in its charge*, may place limitations on speech.") (emphasis added)).

In this case, the record before the district court at the preliminary injunction hearing indicated that Denver is the owner of the Courthouse and its surrounding grounds. It was also undisputed that there is no lease agreement between Denver and the Judicial District that could have transferred some of Denver's property interests to the Judicial District. And the Judicial District is not the only occupant of the building; the county also has courtrooms in the building. As a result, Denver's intent will be particularly relevant to a determination of whether the Restricted Areas were designated as a public forum.

Nevertheless, the Judicial District argues Denver may not unilaterally designate the Restricted Areas as public fora because, under Colorado law, the state judicial branch is endowed with inherent authority as an independent and co-equal branch of government to regulate state courthouses. The first problem with this argument is that it ignores the limits of that inherent authority. Although Colorado permits its courts to do all that is "reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence, and integrity, and to make its lawful actions effective," the Colorado Supreme Court has recognized that this inherent authority is not without its limitations. *Bd. of Cty. Comm'rs of Weld Cty. v. Nineteenth Judicial Dist.*, 895 P.2d 545, 547–48 (Colo. 1995) (quoting *Pena v. District Ct.*, 681 P.2d 953, 956 (Colo.1984)). Specifically, the "court's inherent authority terminates when its ability to carry out its constitutional duty to administer justice is no longer threatened." *Id.* at 549.

On the existing record, the Judicial District has not demonstrated that Plaintiffs' First Amendment activities interfered with the ability of the Judicial District to carry out its essential functions. Mr. Steadman testified that Plaintiffs' pamphleteering presented no security risk to the Courthouse. And the Judicial District presented no evidence indicating that the narrow preliminary injunction issued by the district court would interfere with its judicial functions. On the record before us, therefore, the Judicial District has not demonstrated that the preliminary injunction issued by the district court implicates the court's inherent authority.

But it is also true that Denver's statement of its intent is only one factor to be considered by the district court in determining whether a permanent injunction should issue. Recall that the government's statement of policy should be weighed against the evidence of its actual practice to avoid post hoc justifications. *See Air Line Pilots*, 45 F.3d at 1153; *Hays Cty. Guardian*, 969 F.2d at 117–18. Denver's concession in the Stipulation and its expressions of past intent could be motivated by fiscal or other considerations that are inconsistent with its actual practice.

For example, although the evidence indicated that some expressive activity has occurred in the Restricted Areas, those occasions may have been "isolated incidents of undiscovered violations," rather than evidence of affirmative acts to open the Restricted Areas as public fora. *Gilbert I*, 920 F.2d at 885. And a contrary intent might be gleaned from the design of the Restricted Areas and the extent to which public and private areas are clearly separated. *See Grace*, 461 U.S. at 179–80. Also of importance in assessing whether the Restricted Areas have been designated as public fora is the extent to which

56

doing so is incompatible with the primary use of the Courthouse. *See Cornelius*, 473 U.S. at 803. That is, it would be strong evidence that Denver did not intend to designate all of the Restricted Areas as public fora if to do so would destroy the primary function of the Courthouse. Or in different terms, the district court must assess whether it is credible that a governmental owner would construct a courthouse and install state and county judicial operations within it, only to designate public fora so intrusively that the essential function of the courthouse is thwarted. Thus, although the Stipulation provides some evidence on the question of whether the Restricted Areas have been designated as public fora, it is not alone determinative of that question.

## III.    CONCLUSION

Based on the record before it, the district court did not abuse its discretion in granting Plaintiffs' request for a preliminary injunction. We therefore AFFIRM the order entering a limited preliminary injunction in favor of Plaintiffs, and REMAND for further proceedings consistent with this decision.

57