**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 19, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CELEBRITY ATTRACTIONS, INC., an
Oklahoma corporation,

     Plaintiff - Appellant,

v.

OKLAHOMA CITY PUBLIC
PROPERTY AUTHORITY, a public trust
and blended component unit of The City of
Oklahoma City; CIVIC CENTER
FOUNDATION, an Oklahoma nonprofit
corporation,

     Defendants - Appellees.

No. 16-6013
(D.C. No. 5:15-CV-01267-HE)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **BACHARACH** and **MORITZ**, Circuit Judges.
_____

Celebrity Attractions, Inc., appeals from the district court's order denying its

request for preliminary injunctive relief in a dispute over its presentation of a Broadway

show season.  Exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we affirm.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
submitted without oral argument.  This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel.  It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

BACKGROUND

Celebrity "present[s] live theatrical entertainment in seven cities in a four-state region." Aplt. App., Vol. IV at 834. It has produced Broadway show seasons for over twenty years in the Thelma Gaylord Theatre inside Oklahoma City's Civic Center Music Hall. The Oklahoma City Public Property Authority operates the Music Hall under a long-term lease from the City of Oklahoma City. Fundraising for renovating and operating the Music Hall is handled by the Civic Center Foundation.

Performances at the Music Hall are scheduled several years in advance. In January of the year set for a particular performance, the Authority typically issues a permit to use the Music Hall, and then enters into a box office agreement with the permittee addressing ticketing services.

In January 2015, the Authority issued a use permit to Celebrity for the 2015-16 season. Both the permit and the accompanying box office agreement gave the Civic Center box office, "which is part of the [Authority,] . . . the sole and exclusive right to sell, handle, distribute, or otherwise disburse all admission tickets." *Id.*, Vol. I at 37; *see also id.*, Vol. III at 666. But the box office agreement designated Celebrity as "the Primary Box Office for season ticket renewals," and it gave Celebrity "full authority to sell season, group and individual tickets for the listed event." *Id.*, Vol. III at 668. Further, the box office agreement provided that (1) "[a]ll account information collected for storage and use on [the Civic Center box office] ticketing system, is considered the intellectual property of [the Civic Center box office] and the . . . Authority"; and (2) "the

2

[Authority's general manager or his designee] retains the right to access information for use in the promotion of upcoming events." *Id.* at 667.

In June 2015, in order to fundraise, operate, and renovate the Music Hall, the Foundation agreed with the City and the Authority to (1) co-present "one annual national touring 'Broadway Show' season" beginning with the 2016-17 season; and (2) exercise a right of first refusal to present or co-present "single night, full week and split week Broadway show performances." *Id.* at 690. The Music Hall's manager notified Celebrity of the agreement, explaining that "no additional season permits [would] be issued to Celebrity," that "all tentative Broadway dates [would] be transferred to the . . . Foundation," and that the Foundation would be seeking a co-presenter for the 2016-17 season. *Id.* at 711. The Foundation notified past patrons of the Broadway show series that it was in the process of "select[ing] a new co-presenting partner." *Id.*, Vol. II at 413.

Celebrity applied to be a co-presenter, but wasn't selected. Nevertheless, on September 24, 2015, it requested a permit to present six Broadway shows at the Music Hall for the 2016-17 season. Celebrity explained that it "began making commitments to Producers and Booking Agents to present these shows four . . . years ago" and that it was "imperative that a permit be issued" so "that the shows will go on as planned." *Id.* at 333. The Authority denied Celebrity's request, stating that "[b]ased on th[e] [presentation] agreement, the tentative dates discussed with Celebrity . . . for the 2016-2017 Broadway Show Series have been released to the Foundation and therefore no permit can be issued." *Id.*, Vol. III at 730.

3

In response, Celebrity filed this 42 U.S.C. § 1983 action against the Authority and the Foundation. Celebrity asserted against both defendants free-speech and equal-protection claims. Against the Authority, Celebrity additionally alleged claims for breach of contract and breach of the implied duty of good faith and fair dealing. Against the Foundation, Celebrity added claims for trade-secret misappropriation and interference with prospective economic advantage. For relief, Celebrity sought, among other things, a preliminary injunction compelling the Authority to issue a use permit for the 2016-17 season and prohibiting the Foundation from using its customers' information. The district court denied injunctive relief, prompting this appeal.

## DISCUSSION

### I. Standards of Review

We review the denial of a preliminary injunction for an abuse of discretion, "examin[ing] the district court's factual findings for clear error and review[ing] its legal determinations de novo." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). "To obtain a preliminary injunction, the moving party must [show] four factors: (1) a likelihood of success on the merits; (2) a likelihood that [it] will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in [its] favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). When, as here, preliminary injunctive relief would compel "the nonmoving party to take affirmative action," the moving party must make "a heightened showing of the four factors." *Id.* at 1208–09.

4

## II. Compelling the Issuance of a Use Permit

### A. Irreparable Harm

The district court concluded that Celebrity was not entitled to injunctive relief because it had not made a heightened showing of irreparable harm, as it could adequately be compensated with monetary damages for losing the opportunity to present the 2016-17 Broadway show season. *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (stating that "economic loss is usually insufficient to constitute irreparable harm"). Nevertheless, Celebrity argues its inability to promote the 2016-17 season will result in lost goodwill and damages to its reputation and that these losses are difficult to measure monetarily and thus are irreparable.

Granted, irreparable harm may be "based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer." *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (internal quotation marks and brackets omitted). But Celebrity doesn't cite any such evidence. And as the district court noted, "damage to a corporation's business reputation will, at some point, translate into lost bookings, lost business opportunities . . . and, ultimately, into lost profits," which are subject to measurement given Celebrity's "track record in multiple markets and [its] long history" promoting Broadway shows. Aplt. App., Vol. IV at 791.

We agree with the district court that Celebrity has not established a heightened showing of irreparable harm if an injunction is not granted. Although that determination is conclusive regarding injunctive relief on Celebrity's common-law claims to compel issuance of a use permit, it does not end our inquiry regarding Celebrity's free-speech

5

claim. This is so because there is a presumption of irreparable harm for the loss of First Amendment freedoms. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Cmty. Commc'ns Co., Inc. v. City of Boulder*, 660 F.2d 1370, 1376 (10th Cir. 1981). Thus, we next consider whether Celebrity has met its burden to show success on the merits of its free-speech claim.[1]

B.     Free Speech

"To determine when and to what extent the Government may properly limit expressive activity on its property, the Supreme Court has adopted a range of constitutional protections that varies depending on the nature of the government property, or forum." *Verlo v. Martinez*, 820 F.3d 1113, 1129 (10th Cir. 2016). There are "three types of speech fora: the traditional public forum, the designated public forum, and the nonpublic forum." *Id.* Traditional public fora are places like streets and parks, which "by long tradition have been open to public assembly and debate." *Id.* A designated public forum is "government property that has not traditionally been regarded as a public forum [but which] is intentionally opened up for that purpose." *Id.* at 1141 (internal quotation marks omitted). A nonpublic forum is government property that is not by tradition or designation a forum for public discourse. *See id.* at 1129. "[T]he Supreme Court has also recognized that the government can create a 'limited public forum' by allowing selective access to some speakers or some types of speech in a nonpublic forum,

---

[1] Celebrity doesn't contest in its opening brief the district court's conclusion that it is not likely to succeed on the merits of its equal-protection claim. "[A]rguments not raised in the opening brief are waived." *City of Colo. Springs v. Solis*, 589 F.3d 1121, 1135 n.5 (10th Cir. 2009).

6

while not opening the property sufficiently to become a designated public forum." *Id.* at 1129 n.6 (internal quotation marks omitted).

"Because the nature of the forum dictates the standard of scrutiny with which restrictions on speech are reviewed, courts typically begin the analysis of a challenge to restrictions on speech involving government property by identifying the nature of the forum involved." *Id.* at 1129. Here, the district court characterized the Music Hall's Thelma Gaylord Theatre as a limited public forum rather than a designated public forum because the theater

> is not open to all forms of expression in the sense that, for example, a public library is open to the receipt of information by virtually any means.[2] Rather, the performance hall, at least in recent years, has been substantially devoted to large scale productions involving what [Celebrity] refers to as the "higher arts"—ballets, symphonies, Broadway shows, and the like. The facility is not open on an indiscriminate basis to anyone, or any entity, which wants to put on a play or music presentation. The city has historically used a permitting process which, by design, focuses on the productions of the resident artists.

Aplt. App., Vol. IV at 794.

Celebrity disputes the district court's characterization of the theater, arguing it is a designated public forum. Celebrity relies on *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788 (1985), where the court held that a charity drive aimed at federal employees qualified as a nonpublic forum. In so holding, the Supreme Court contrasted the charity drive with the "municipal auditorium and . . . city-leased theater" found to be "a public forum" in *Southeastern Promotions, Ltd. v. Conrad*, 420

---

[2] In *Doe v. City of Albuquerque*, 667 F.3d 1111, 1129 (10th Cir. 2012), this court held that a public library is a designated, rather than a limited, public forum.

U.S. 546 (1975). *Cornelius*, 473 U.S. at 803. But Celebrity's reliance on *Cornelius* and *Southeastern Promotions* is misplaced in that both cases predate the Supreme Court's delineation of limited public fora as a distinct type of government property. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1130 (10th Cir. 2012) (observing that "the Supreme Court has only recently clarified the terminology of 'designated' and 'limited' public fora" (citing *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661 (2010), and *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)). Indeed, *Cornelius* identified the universe of fora as only "the traditional public forum, the public forum created by government designation, and the nonpublic forum." 473 U.S. at 802. Moreover, at least one Circuit court views *Southeastern Promotions* as indicating that "city-leased theaters" are limited public fora. *See Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002).

In any event, this court has offered "three non-exhaustive factors to consider in determining whether the government has created a designated public forum" instead of a limited public forum: (1) the forum's purpose; (2) the extent of the forum's use; and (3) the government's intent in opening the forum to the public. *Doe*, 667 F.3d at 1129. As the district court found, the purpose of the Thelma Gaylord Theatre is to serve as a venue for large scale productions of art forms like ballets, symphonies and Broadway shows. That purpose indicates a selective design as to the speakers and types of speech allowed at the theater, which suggests a limited public forum, *see Verlo*, 820 F.3d at 1129 n.6.

8

As to the second factor, the extent of the forum's use is limited. The theater is not open to all speakers indiscriminately. Even speakers engaged in the art forms listed above must seek a permit to use the theater. Further, the permitting process is largely focused on groups "that offer season show packages," as that "is the best method to reduce the financial risk and to secure the number of attendees necessary . . . to break even or make a profit." Aplt. App., Vol. III at 646, 647-48. This limited access is inconsistent with the general access to a designated public forum. *See Doe*, 667 F.3d at 1129 (identifying a designated public forum as one with "general access to, or indiscriminate use of, the forum" (emphasis and internal quotation marks omitted)); *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 496 (9th Cir. 2015) ("The defining characteristic of a designated public forum is that it's open to the same indiscriminate use and almost unfettered access that exist in a traditional public forum." (citations and internal quotation marks omitted)).

As to the third factor—the government's intent in opening the property to the public—the Authority operates the theater under lease from the City "to bring year-round, world class entertainment, by offering the best of ballet, theatre, Broadway, chorus, and orchestra and to develop a revenue stream needed to maintain, operate and upgrade the [venue]." Aplt. App., Vol. III at 645. This factor, like the others, weighs in favor of finding the Thelma Gaylord Theatre to be a limited public forum as it has been opened for use by only "certain groups or dedicated solely to the discussion of certain subjects." *Martinez*, 561 U.S. 679 n.11 (internal quotation marks omitted).

9

Nevertheless, Celebrity contends the theater qualifies as a designated public forum because it is not used "exclusively" for the limited range of artistic expression noted above, Aplt. Opening Br. at 15, and because the lease requires the Authority to "provid[e] *public* events, facilities and accommodations for entertainment purposes," Aplt. App., Vol. I at 271 (emphasis added). But we are not persuaded that these points have any significant bearing on the requisite forum analysis. Instead, we conclude the theater's overarching purpose, the extent of its use, and the government's intent in opening it to the public show "selective access to some speakers or some types of speech"—the hallmarks of a limited public forum. *See Verlo*, 820 F.3d at 1129 n.6 (internal quotation marks omitted).

The next step of the constitutional analysis requires that we assess whether the challenged speech restriction is "reasonable and viewpoint-neutral." *Martinez*, 561 U.S. at 679 n.11 (internal quotation marks omitted); *see also Shero v. City of Grove*, 510 F.3d 1196, 1202 (10th Cir. 2007) ("Any government restriction on speech in a limited public forum must only be reasonable in light of the purpose served by the forum and be viewpoint neutral."). Celebrity doesn't address the district court's application of this standard. Instead, Celebrity addresses only the strict-scrutiny standard applicable to designated public fora. *See Verlo*, 820 F.3d at 1133 n.8 ("Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." (internal quotation marks omitted)). Consequently, Celebrity has waived any challenge to the district court's conclusion that selection of the Foundation and a co-presenter—instead of Celebrity— to produce Broadway show

10

seasons is reasonable and viewpoint-neutral.  *See Solis*, 589 F.3d at 1135 n.5 (observing

that the failure to raise an issue in an opening brief waives that issue).

Because Celebrity hasn't shown a likelihood of prevailing on the merits of its

free-speech claim, and because it hasn't otherwise demonstrated irreparable harm from

the denial of a preliminary injunction, we conclude the district court didn't abuse its

discretion in denying Celebrity's request for injunctive relief compelling the issuance of a

use permit for the Thelma Gaylord Theatre.

### III.  Prohibiting the Use of Subscriber Information

Celebrity maintains that the Foundation misappropriated its customers' subscriber

information and contacted them in violation of Oklahoma's Uniform Trade Secrets Act.

78 Okla. Stat. Ann. §§ 85-94.  Under the act, "[a]ctual or threatened misappropriation

may be enjoined" for a "reasonable period of time in order to eliminate commercial

advantage that otherwise would be derived from the misappropriation."  *Id.* § 87(A).

The district court concluded that Celebrity failed to show it was likely to prevail

on the merits,[3] given the box-office agreement's provision that "[a]ll account information

collected for storage and use" on the ticketing system (1) "is considered the intellectual

property of [the Civic Center box office, which is part of the Authority] and the

[Authority]"; and (2) may be used by the Authority or a designee for promoting

---

[3] The district court declined to relax the traditional showing necessary for the likelihood-of-success factor, *see Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.6 (10th Cir. 2006), finding that the other three factors did not "tip decidedly in [Celebrity's] favor," *id.* (internal quotation marks omitted).  We need not address that analysis, as it is clear Celebrity has shown *no* likelihood of success on its trade-secret claim.

11

upcoming events. Aplt. App., Vol. III at 667. Celebrity argues that because it "serve[s] as the Primary Box Office for season ticket renewals," *id.* at 668, it exclusively owns the subscriber information. Aplt. Opening Br. at 34-35 (stating that "the only 'use' for which season ticket subscriber [information] was stored on the [ticketing] system as far as the [Authority] was concerned was an occasional attempt by the [Authority] to sell something *other than* season tickets").

But the box-office agreement isn't amenable to such a tortured interpretation. First, it broadly confers ownership of "[a]ll account information" on the Authority regardless of who collected, stored, and used it. *See* Aplt. App., Vol. III at 667. Second, even if Celebrity is the "primary" source for season ticket renewals, that doesn't mean it is the exclusive source. Indeed, both the use permit and the box-office agreement give the Authority "the sole and exclusive right to sell, handle, distribute, or otherwise disburse *all* admission tickets," Aplt. App., Vol. I at 37 (emphasis added); *see also id.*, Vol. III at 666. Under these circumstances, we construe the contractual language to mean that, at most, both Celebrity and the Authority own the subscriber information collected and stored through the ticketing system. And as an owner, the Authority can't be liable for utilizing information it owns. *See* 78 Okla. Stat. Ann. § 86(2) (defining misappropriation as the acquisition, disclosure, or use "of a trade secret of another").[4]

---

[4] To the extent Celebrity attempts to rely on an "Interlocal Agreement" as determinative of the ownership issue, Aplt. Opening Br. at 33, we note that Celebrity inconsistently argued in the district court that the agreement had no effect on its ownership rights. Accordingly, we do not consider that agreement.

In sum, we conclude that the district court didn't abuse its discretion in denying preliminary injunctive relief prohibiting the use of ticket subscriber information.

## CONCLUSION

We affirm the district court's order denying preliminary injunctive relief.

Entered for the Court


Nancy L. Moritz
Circuit Judge